# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  18 CR 00478-1 |
| | ) | |
| QUAN SHUN CHEN, | ) | Judge Edmond E. Chang |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT QUAN SHUN CHEN'S SENTENCING MEMORANDUM

Defendant, QUAN SHUN CHEN, by and through his attorney, Michael Raff, respectfully requests, pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005), its progeny, and 18 U.S.C. §3553(a), that this Honorable Court impose a sentence of no greater than thirty-six (36) months' probation. In support, Mr. Chen states as follows:

## I.      INTRODUCTION

This statement is submitted in order to allow the Court to become more familiar with the defendant, Quan Shun Chen, prior to his sentencing.  Attached are letters from Quan's family members, all of which request that the Court impose the most lenient sentence permitted, due to the various reasons stated therein.  A review of these letters will demonstrate to the Court that Quan's character and nature suggest that justice will be served by sentencing him to probation.

## II.      SENTENCING LETTERS

The Court is familiar with the use of letters as a vehicle to provide additional information to the Court in the sentencing process.  Although there are other methods of conveying information, this remains an efficient process and one that does not, in my opinion, suffer too much from the fact that the writers are not directly available for examination.  I imagine that the Court finds that the true character of the writers comes clearly through.  Many of the authors of the letters will be present for sentencing and will, if the Court wishes, be available for the Court's questions.

There is some similarity in the letters.  A review of the letters shows that they are genuine.  Despite similarities in *form*, the content of the letters clearly reflects the unique view of the writer.

### III. A SENTENCE WITHIN THE GUIDELINE RANGE WOULD BE GREATER THAN NECESSARY TO ACHIEVE THE LEGITIMATE PURPOSES OF SENTENCING

This court is obligated to impose a sentence "sufficient, but not greater than necessary," to foster the purposes set forth in paragraph (2) of 18 U.S.C. §3553.1.  The purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other  correctional treatment in the most effective manner.

This framework for sentencing— requiring that the imposition of sanctions be necessary to achieve legitimate governmental ends—is not merely a statutory mandate; it is a *constitutional* imperative. While the phrase "not greater than necessary" is euphemistically referred to as the "parsimony clause," it is in reality a manner of codifying the constitutional doctrine of "the least restrictive alternative."

### A. The Doctrine of the Least Restrictive Alternative

When the government, in the pursuit of an otherwise legitimate objective acts in such a way as to encroach upon a fundamental right, due process requires that the government and its agents utilize the least drastic procedures available in pursuit of that objective. Rules encroaching upon or limiting fundamental rights may only be justified by a "compelling state interest." This doctrine was applied initially by the Supreme Court in the context of free speech—*Shelton v. Tucker*, 244 U.S. 479 (1960), *NAACP v. Button*, 371 U.S. 415 (1963)—but it has been steadily expanded to mean that whenever governmental action affects a fundamental right, alternatives which impose a lesser, rather than a greater, infringement upon the designated liberty must be pursued. *Kramer v. Union Free School District*, 395 U.S. 621 (1969) (voting); *Shapiro v. Thompson*, 394 U.S. 618 (1969) (travel); *Sherbert v. Verner*, 374 U.S. 398 (1963) (religion), and then only after exacting scrutiny determines that the procedures utilized in pursuit of that interest are the least stringent available.

Government action must be narrowly circumscribed to effectuate only the legitimate interest involved and to avoid the unnecessary invasion of protected freedoms. *Dunn v. Blumstein*, 405 U.S. 330 (1972). The government, therefore, may not constitutionally seek "to achieve its goals by means having a maximum destructive impact" on fundamental rights. *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965).

The cases affirming this doctrine form a watershed of constitutional policy from which due process principles can be drawn to safeguard the sentencing process from arbitrary and standard less decision-making. Although a compelling governmental interest may be fulfilled through sentencing, liberty is a fundamental right, and therefore the principle of the least restrictive alternative should be procedurally and substantially applied to the sentencing process. That is the

2

constitutionally compelled doctrine behind the "parsimony clause." It is also well reflected in the ABA Standards, which state the sentence imposed in each case should call for the minimum sanction which is consistent with the protection of the public and the gravity of the crime. Further a "sentence not involving total confinement is to be preferred in the absence of affirmative reasons to the contrary."

### B. §3553(a) Factors Mitigate Against a Guidelines Sentence

Quan stands before this Court because he has committed a crime. He unwisely signed false tax returns for his brother's business, Hunan Spring, and for his and his nephew's restaurant, Hunan Spring Restaurant. Quan was responsible for providing the financial information of the restaurant to his accountants, and he controlled and oversaw all of Hunan Springs' day-to-day financial operations, which included the signing of Hunan Springs federal and state income tax returns as well as the sales tax returns.

### Background of Quan Shun Chen

Quan is a fifty-three year old married father of two children. Quan was born in 1965 in Fujian, China, as one of the youngest of 10 siblings. Quan was raised to follow the strict set of rules his parents imposed, which set forth no drugs and no alcohol. To this day, Quan has never tried either. Although Quan only had a 6th grade education, he worked hard to provide for his family.

Quan and his wife Xiu Yun Zheng have been married for 31 years. Quan and Xiu Yun met each other and got engaged through an arranged marriage in 1982 in Fujian, China. After being engaged for five years they married in 1987. Quan and Xiu Yun have a son, Xiao Bin Chen, and a daughter, Xiao Ling Chen.

In 1994, Quan and Xiu Yun decided that it would be beneficial for the family's future to move to the United States, and in that year Quan traveled to Brooklyn, New York to seek employment. Later that year, he heard from his older brother that he had opened a restaurant in Chicago and needed help. Quan and Xiu Yun determined that this move would be beneficial for the family. Quan moved in 1994, followed after in 2002 by Xiu Yun Zheng and the children. Quan and Xiu Yun became official United States citizens in 2011.

### Quan's Work for Hunan Spring

From 1994 through 2015, Quan worked for his brother, Gang Kai Chen, as a chef at the Hunan Spring restaurant in Evanston, Illinois. (Presentence Investigation Report, "PSR" at ¶23). Quan had no managerial role in the business until 2007; at that time, Quan's name was added to the bank account as a signatory to assist in paying for expenses. Thereafter, Gang Kai Chen developed cancer and was unable to partake in the day to day business operations, so Quan developed a larger role in the business. Quan did not speak English, so he had limited front of house responsibilities. *Id.*

3

From 2007 through 2015[1] Quan helped to manage Hunan Spring restaurant while his brother was unable to work. *Id.* at 24. Quan was responsible for maintaining staffing, inventory and overall restaurant management. Quan also was in charge of the relationship with Hunan Spring's accountant, Maria Tai and her staff, with whom Gang Kai had worked with in the past. Quan was named an officer of Hunan Spring around 2007. *Id.*

**Hunan Spring Accounting**

Quan worked with Ms. Tai's office in the same manner that he learned from his brother. Quan provided Ms. Tai's office with the Hunan Spring bank statements so she could reconcile the company information.[2] *Id.*

Ms. Tai never asked for a copy of the Hunan Spring "Z Tapes" (receipts) nor a copy of the Hunan Spring Point of Sale system records. *Id.* at ¶25. The United States alleges that Quan utilized a POS deletion software program to delete 9,700 transactions from Hunan Springs sales database. *Id.* at ¶18. Quan strenuously denies this allegation. *See Id.* at ¶25. The United States argues that their agents were able to determine when orders were deleted by reviewing order number sequencing contained within the POS system. However, a review of the Hunan Spring POS database shows order sequencing issues only very early on in the POS database installation between late 2011 and early 2012.[3] *Id.* While Quan cannot explain the order sequencing issues in this early time period, he believes any early sequencing issues may stem from software demonstrations while the business was still learning the functionality of the POS. *Id.* Those demonstrations were performed by the POS system supplier, who advised that the POS system *could* perform order deletion functionality. Quan never desired to, and categorically denies, ever utilizing such functionality. In fact, Quan never knew that any actual orders were deleted from the POS until provided some evidence of the same during this matter. If this is what had happened, neither Quan nor the restaurant utilized nor benefitted in any way from these early deletions, as the Z Tapes were not provided to Ms. Tai's office.

Quan acknowledges responsibility for the underreporting of the Hunan Spring gross receipts. He can now see how his interactions with Ms. Tai failed to accurately report the restaurants top line income, and can further understand that this means that not all taxes (specifically states sales taxes) were properly accounted for. Quan also believes that his interactions with Ms. Tai's office likely reduced the expenses Hunan Springs was entitled to decrease its revenue by. However, Quan never intended to deceive or defraud the United States or the State of Illinois, and he never performed any aggravating acts such as deleting or suppressing sales from his POS.[4]

---

[1] In 2015, Quan Shun and his brother's son, Sheng, took over joint ownership of the restaurant; they are co-owners to this day under the name "Hunan Spring Restaurant, Inc."

[2] In the later years, Quan Shun would also provide Ms. Tai with statements from Grubhub and Beyond Menu

[3] The only other time period with a data sequencing issue is on July 10, 2015 which is when Hunan Spring reopened after a multi-month renovation to the restaurant. The data shows no orders between January and July 2015, but this is factually inaccurate as the restaurant operated past January 2015. This is merely a data sequencing error, and not a function of orders deleted from the POS.

[4] As shown by both the lack of order deletion data during the relevant time period of March 1, 2012-December 31, 2016 and as further evidenced by Quan Shun not delivering the POS reports to Ms. Tai.

4

Although he will now be considered a felon for the remainder of his life, Chen is not a career or master criminal. He is a hard working family man who dedicated his life to making a life for his family and children in the United States. The letters submitted to the Court show that Quan is a good person who is worthy of the mercy of this Court.

In her letter to the Court, Quan's wife Xiu Yun Zheng writes about Quan's work ethic and his commitment to his family:

> My husband was working more than ten hours every day and he still does. After many years of hard work, he was finally able to bring us to the States for our family to be reunited. However, our arrival brought even more pressure on my husband, for now there were school expenses and additional living expenses. My health is not in a good condition and I have needed chronic treatment and long-term medications. He is the pillar of our family. He always values everyone in our family more than himself. He is a very responsible man. He has been working and supporting our family all of these years. As he ages, along with his many years of working in a high intensity and stressful career, my husband has now developed some health concerns of his own; high blood pressure and kidney issues. He needs to take medicine every day. Regardless of his ailments, he continues to stay strong for our family.

*Letter of Xiu Yun Zheng at page 1,* attached as Exhibit A.

In her letter to the Court, Quan's daughter Xiao Ling Chen writes about finally being reunited with her father after not seeing him for eight years in her early childhood:

> Even though he was so far away, Baba [Quan] always called home and checked on us. Because there was no internet, he'd always send pictures and letters home. Although Mama was the only one living with us, we knew he was always there for us as well. Growing up, I did not feel much different from other kids, who had fathers living with them. Both my brother and I grew up with love. Mama did not have to work and was able to focus on taking care of us. That was possible because Baba took care of the other part of hard work. I mostly knew about Baba through Mama, pictures, phones calls and letters. I always thought of him as our role model who is strong, hardworking, respectful and reliable. He always only shared good news, so we were confident that he was doing well overseas. I always thought that he was such a strong man and would never have any issues. He is the man our family all look up to and rely on after all. My brother and I had a great childhood because of Baba and Mama's hard work from both outside and inside the house.
>
> After eight years of separation, my family finally reunited. It was a very unique experience, because we were finally meeting our father again, who we had seen only in photos and heard through the phone for so long. Regardless of the strange feeling, we felt that our family was more complete, because we had both Baba and Mama with us! We settled in our new home quickly and soon after, we were in school. He made sure that nothing was holding back our education, unlike him who had to give up education to work at a young

5

age. At the time things went very smoothly because of my dad. He was prepared so that we didn't have to worry about anything.

*Letter of Xiao Ling Chen, dated February 26, 2019, at page 1,* attached as Exhibit B.

In his letter to the Court, Quan's son Xiao Bin Chen reflects on the characteristics that makes Quan a good dad:

> As a son, I could not ask any more from a father. He works seven days a week to provide for my family. He does not smoke, drink or gamble. He is always trying his best to provide for my sister and me. I am proud to have him as my father.

*Letter of Xiao Bin Chen, dated March 13, 2019, at page 1,* attached as Exhibit C.

Having reviewed the background of Quan and the impact of his loss on his wife, daughter and son, let us return to the law of sentencing and the question Congress—and the Constitution— put before the Court: Is it necessary, in order to address the legitimate purposes of sentencing, to impose a guidelines sentence against Quan? The answer is clearly no.

### 1. The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense

Quan readily acknowledges the seriousness of this offense. The question of "just punishment" is, however, the overarching question in this case. Quan suggests that a sentence of no greater than 36 months' probation fulfills the objectives of promoting respect for the law and in providing just punishment for this offense.

### 2. The need to afford adequate deterrence to criminal conduct

Deterrence is a factor to be considered in relation to the public at large as well as a factor to consider specific to Quan. A sentence of no greater than 36 months' probation is more than adequate to provide a deterrent effect to the general public. As the facts of this case have shown, Quan is a hard working man that put everything he could into supporting his family. This included leaving his family in China while he sought work in the United States. He was fortunate enough to work at his brother's restaurant for nearly twenty years, only taking over operations when his brother became too ill to work. He found himself in a bad position of continuing accounting practices which had been put into place for years before he was in charge, and ultimately under reporting the family business' revenues. Because of his foolish crime, he will stand as a convicted felon. Such a sad end would await others who think about committing such a crime. A sentence of no greater than 36 months' probation will accomplish the goals of general and specific deterrence. Quan will stand as the prime example for others in the restaurant business to steer clear of any involvement in the misreporting of income.

### 3. The need to protect the public from further crimes of the defendant

Besides the case at bar, Quan has no other incidents of criminality. Quan has learned a valuable lesson about ensuring that his conversations with and the documentation presented to his accounting team is as detailed and possible, and will take further ownership of reviewing all tax filings with their assistance to ensure accuracy.

### 4. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner

This factor is not applicable to Quan as he will continue to operate Hunan Springs Restaurant at the conclusion of this case.

### 5. The kinds of sentences available and the sentencing range established by the Sentencing Commission

The United States Sentencing Guidelines are no longer mandatory, but instead provide a "starting point" for the Court's sentencing decision. *Gall v. United States*, 552 U.S. 38 (2007); accord *Cunningham v. California*, 549 U.S. 270 (2007). District courts are now required to consider the Guidelines but should "tailor the sentence in light of other statutory concerns, as well." *Kimbrough v. United States*, 552 U.S. 85 (2007). As a result, the Court must consider all the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 128 S.Ct. at 596.

United States Probation Officer Danielle Stern calculated Quan's potential guideline sentence. Based upon this calculation, Quan is facing a range of punishment of 18-24 months imprisonment. To be certain, the guidelines are only advisory in nature and this Court may deviate from such a range when appropriate.

Ms. Stern, in her Sentencing Recommendation, stated that based on Quan's personal history, the fact that this was the first crime that he has committed, that his business will suffer without him present, and that Chen is not a threat to commit future conduct, that he should receive a sentence 6 months of incarceration followed by one year supervised release. Ms. Stern wrote:

> Although the offense of the conviction is serious, it is the defendant's first criminal conviction. A felony record coupled with the impact this offense has had on the defendant, appear to have sufficiently deterred defendant from future criminal conduct. Moreover, if sentenced to a term of imprisonment, the defendant's business will undoubtedly suffer, which will negatively impact his employees and affect his ability to repay restitution.

*Probation Officer's Sentencing Recommendation*, p. 2.

Ms. Stern acknowledged that she has trouble formulating an appropriate sentence for Quan. *Id.* Ms. Stern states that, in part, her decision to view this infraction as non-minor stems from the allegation contained in the Government's Version of the facts that Quan requested a database

manager to be installed when the point of sale system was installed in 2016. *PSR* at ¶ 18. The Government's version then states that there is no knowledge that the defendant called the other individual or had a new database manager installed. *Id.*

While Quan acknowledges the significance of the underreporting of his gross receipts, he strenuously denies the allegations put forth by the United States that he ever requested, either directly or indirectly, for the database manager or "zapper" software to be placed on the point of sale system. While he erred in signing tax returns that underreported gross receipts for Hunan Springs, Quan remains steadfast that he never took affirmative steps to evade or avoid detection form authorities, such as by using or specifically requesting the database manager program be installed on the restaurant point of sale system.

### 6. The need to avoid disparities

Quan is the sole defendant in this case. However, a review of similar cases show that a sentence of probation is warranted in the case at bar. Recently, in February 2019, in the case of *United States v. Sandra Sanchez,* 18 CR 474, Judge Lefkow, of the Northern District of Illinois, sentenced the defendant to three years' probation, for understating federal income and employment taxes which resulted in a federal restitution amount of $326,621. Notably, the defendant in this case also stated in her plea declaration that she intentionally used sales suppression software. This is juxtaposed to the instant case where Quan denies the use of such software.

In the case of *United States v. Lee Lee Foong,* No. 13 CR 50030-2, Judge Kapala, of the Western Division for the Northern District of Illinois, sentenced the defendant to two years' probation, for failing to report $284,890 received by her and her husband's business which caused a tax loss of over $92,000.

In the matter of *United States v. Becky Neeb*, 18 CR 26, in the United States District Court for Nebraska, the defendant plead guilty to under-reporting her receipts and over-reporting her expenses for her business over a three-year period for a tax loss in the amount of $137,000. The defendant received a sentence of five years' probation.

Most notably, in the matter of *United States v. H. Ty Warner*, 13 CR 731-1, the defendant plead guilty to tax fraud and admitted under reporting his income by over 24 million dollars, culminating in a tax loss of over $5,000,000. The defendant in that case received a sentence of two years' probation from Judge Kocoras.

### 7. Restitution to Victims

Based on discussions between Quan and the United States, restitution is owed to the United States in the amount of $315,453 and to the State of Illinois in the amount of $139,209. Quan is attempting to pay as much of this restitution is possible prior to sentencing. If the defendant receives a sentence of probation, he can continue to work and operating Hunan Springs Restaurant and paying both current taxes and the remaining unpaid restitution.

8

### IV.    MOTION FOR SENTENCE BELOW THE GUIDELINE RANGE

Quan respectfully requests that the Court impose a sentence below the guideline range established in the PSR. Quan is requesting that he be sentenced to a term of no greater than thirty-six (36) months' probation.

### V.    CONCLUSION

The Court is bound—morally and constitutionally—to impose no harsher a sentence than what is truly and objectively necessary to achieve the legitimate purposes of sentencing. The Supreme Court has made it clear that district court judges can again consider as judges what they know as human beings—that a sense of moral proportion does not have to be left outside the courtroom door.

Clearly, Quan has made a significant error by underreporting the Hunan Spring gross receipts and should not have been involved in tax fraud. However, this matter aside, he has led a crime free life of work dedicated to his family. He sacrificed the first crucial years of his children's life so he could provide them with opportunities that he never had as one of the youngest children in a family of ten.

We ask that this court impose a lenient sentence, so as not to punish Quan, or his family, or business, any further. The court should use its broad latitude to fashion a non-guidelines sentence for Quan, no harsher than truly and objectively necessary. 18 U.S.C.§ 3553(a); See also, *United States v. Reyes*, 557 F.3d 84, 87 (2d Cir. 2009). For the foregoing reasons, Quan Shun Chen respectfully suggests that a sentence of no greater than 36 months' probation is sufficient but not greater than necessary to achieve the statutory objectives set forth in 18 U.S.C. § 3553 and comports with the considerations set forth in the United States Sentencing Guidelines.

Respectfully submitted,

Quan Shun Chen

By:  s/Michael Raff
Michael Raff

Michael Raff
Gordon Law Group
400 Central Ave.
Suite 340
Northfield, IL 60093

9

# EXHIBIT A

The Honorable Judge Edmond E. Chang
United States District Court
219 South Dearborn Street
Chicago, IL 60604

尊敬的法官您好！

我是陈泉顺的太太。我先生平常为人品行端正忠厚老实，热于助人且无任何前科劣迹。就本案我先生店面情况事出有因。

我先生家里兄弟姐妹十个人，又要照顾双方父母。因为他比较孝顺父母重情义，那时候家庭条件差，为养家糊口，多年前来到美国谋生。那时候我的一双儿女还小，我的心像被刀割一般痛，但是为了全家的生活我们别无选择。记得有一年我儿子生病住院，腿需要做手术，我是多么的无助多想他在我身边，为我分担。当时我的心像天塌下来一样，同样他在美国听到儿子生病他也一直牵挂着。可怜他一边打工一边为了孩子吃不好饭睡不着觉。尽管我们无法在对方身边，我们还是坚持过来了，因为我们心里有对方。那么多年，我们靠着电话书信诉说心中的思念安慰着对方，期盼着早日一家团圆。

我先生每天打工长达十几个小时，经历了多年的艰辛的奋斗，才把我和儿女几个接到美国团聚。然而我们来到美国却给我的先生增加了压力，供孩子读书，生活等各种费用增加。做为妻子的我身体又不好需要长期服药。他是家里的顶梁柱，他把家里的每个人都比自己看得都重，他是一个对家庭负责任的男人。他一直靠自己在外打工，这么多年而撑起这个家。随着年龄的增长，以及长年高强度的工作和压力，我先生现在患有高血压，肾也不好，天天需要服药，但为了这个家他一直在坚持着。

后来我的先生哥哥身体不好，到最后被诊断是晚期肾癌，叫我先生帮忙打理餐馆生意，他看到他哥哥被病魔折腾得不像人形，又是亲兄弟只好满口答应帮忙。到后来我先生接管了店里事情，但由于我先生文化水平低，不太懂英文，也看不懂文件，只知道做事，也因此吃了不少亏。关于店里的很多具体细节情况，我也并不知情。法官大人您可以进行调查，我先生一直以来非常积极地配合。请法官大人看在我先生诚心认错，请从轻处罚，我们一家人也绝对会认真配合处理这个事情。

因孩子们都还没成家立业，我的先生作为家中的顶梁柱支撑着我们一家。如果没有他，我们的生活将会变得更艰难，还希望请求法官大人网开一面给我先生重新改过的机会，把餐馆生意经营好早日把钱还给政府。

至此，
郑秀云

郑秀云
Xiu Yun Zheng

Xiu Yun Zheng's Letter to Honorable Judge Edmond Chang
Translation by Xiao Ling Chen (Daughter)

The Honorable Judge Edmond E. Chang
United States District Court
219 South Dearborn Street
Chicago, IL 60604

Dear Honorable Judge,

I am Quan Shun Chen's wife. My husband always shows good character. He is honest and always willing to help others. He has never had any criminal history. For this case, I believe there are some circumstances that need to be considered.

My husband had ten siblings. He also needed to take care of both parents from both sides. Many years ago he came to the United States because of his filial affection for both parents and the poverty that came along with taking care of so many. At that time my children were still very young. I was very sad, however, we had no other choice for the sake of our family. I remember the year when my son was sick and hospitalized, he needed a surgery on his leg. I was devastated as if the world was collapsing and how I wished that my husband could be by my side. While working hard to support our family, my poor husband was having sleepless nights and eating difficulties because of his concern for our son's health. Although we could not be with each other through such a difficult time, we still made it through because we had each other in our hearts. For so many years, we relied on phone calls and letters to express our love, thoughts, and support through bad and good. We were hoping and looking forward to our family reunion to come as soon as possible.

My husband was working more than ten hours every day and he still does. After many years of hard work, he was finally able to bring us to the States for our family to be reunited. However, our arrival brought even more pressure on my husband, for now there were school expenses and additional living expenses. My health is not in a good condition and I have needed chronic treatment and long-term medications. He is the pillar of our family. He always values everyone in our family more than himself. He is a very responsible man. He has been working and supporting our family all of these years. As he ages, along with his many years of working in a high intensity and stressful career, my husband has now developed some health concerns of his own; high blood pressure and kidney issues. He needs to take medicine every day. Regardless of his ailments, he continues to stay strong for our family.

In later years, my husband's older brother was diagnosed with advanced kidney cancer and his health declined. Due to their close relationship, my husband was asked to take care of the restaurant. My husband agreed and as his brother's condition worsened, he took on the management role of the restaurant. Unfortunately, his lack of education and English skills has caused him to suffer greatly, making him unable to read documents and limiting his knowledge to just the physical labor.

I don't know much about the case with the restaurant. Honorable Judge, please investigate if you may. To my knowledge, my husband has been very cooperative throughout the case. He is truly remorseful, please have mercy on his punishment. Our whole family will also sincerely cooperate and help resolve this issue.

My children are not yet established in their own lives, so my husband is still the pillar of our family in supporting us. Our lives will be very difficult without him. I hope Your Honor will be more lenient on punishing him. Please let him have the opportunity to right his wrongdoings, manage the restaurant correctly, and pay back the restitution to the Government as soon as possible.

Sincerely,
Xiu Yun Zheng

# **EXHIBIT B**

The Honorable Judge Edmond E. Chang
United States District Court
219 South Dearborn Street
Chicago, IL 60604

Dear Honorable Judge Chang,

I am writing this letter on the behalf of my father, Quan Shun Chen, the most important man in our family.

When I was asked about my relationship with Baba (Father in Chineśe), I couldn't help but pause and think about it because of how unique my family is. I always think we have a typical father-daughter relationship. Then I realized it may be typical in a Chinese family from my hometown, it is very different in American culture.

Baba came to the United States when I was a toddler, so I learned about him through Mama (Mother in Chinese) who she loves dearly and relies on her whole life. In our family traditions, fathers work to provide for the family, whereas mothers stay home to take care of the children. Baba did not have much education, so there was very limited work he could do. When he heard about opportunities to work overseas, Baba and Mama decided they had to do what was the best for the family. Because my uncles were also in the States for the same reason, they felt more comfortable with him working and living on the other side of the world away from our family.

Even though he was so far away, Baba always called home and checked on us. Because there was no internet, he'd always send pictures and letters home. Although Mama was the only one living with us, we knew he was always there for us as well. Growing up, I did not feel much different from other kids, who had fathers living with them. Both my brother and I grew up with love. Mama did not have to work and was able to focus on taking care of us. That was possible because Baba took care of the other part of hard work. I mostly knew about Baba through Mama, pictures, phones calls and letters. I always thought of him as our role model who is strong, hardworking, respectful and reliable. He always only shared good news, so we were confident that he was doing well overseas. I always thought that he was such a strong man and would never have any issues. He is the man our family all look up to and rely on after all. My brother and I had a great childhood because of Baba and Mama's hard work from both outside and inside the house.

After eight years of separation, my family finally reunited. It was a very unique experience, because we were finally meeting our father again, who we had seen only in photos and heard through the phone for so long. Regardless of the strange feeling, we felt that our family was more complete, because we had both Baba and Mama with us! We settled in our new home quickly and soon after, we were in school. He made sure that nothing was holding back our education, unlike him who had to give up education to work at a young age. At the time things

went very smoothly because of my dad. He was prepared so that we didn't have to worry about anything.

Since Baba has always worked in a Chinese restaurant trying to provide for my family, he never took time himself to learn English. He rarely had time off from work, because it was a family restaurant owned by his older brothers. Since my dad didn't have vacation days, my mother would bring my brother and I to the restaurant to spend more time with him after school and on the weekends. I still remember to this day that whenever he had time, he'd always try to play with us. I treasure the times I spent with him. I will always remember the time when I was learning to roller skate. My father would make sure I had helmets on and well protected, and then he'd take my hand and run next me while I try to balance and skate in the parking lot outside the restaurant. When we were hungry after playing, he'd always make food for us at the restaurant. Although my childhood/teenage years were a bit different from my friends, I always thought I had a great childhood because of my loving and selfless parents.

As I grew older, I started to know more than Baba does because of education. There were and still are a lot of things he doesn't know. He is so sheltered because he had no options other than working nonstop to provide for the family. Regardless, I have also learned that my family is very blessed and that my dad is so loved by the people surrounding him. There are always very kind-hearted people who are willing to help our family. For example, we were able to settle into our new home and school so smoothly because he had gotten help from his coworkers who knew English. He always taught my brother and I to be genuine, kind, respectful of others. Until this day, he is always genuine to others because he believes that there's always good in people. He is the kind of person who always defaults to trusting people and never questions. This is a great value that and my brother and I genuinely hold on to and got us so far in life.

When I learned that Baba actually needs more help that he shows, I slowly stepped in. Baba was happy and let me start reading some mails and documents. The more I was involved, the more I realized how little he knew. I still can't imagine how he's gotten so far with so little English and knowledge in a foreign country. Thankfully, he had friends and family to help him along the way. He was never shy to ask for help on things that he's not familiar with. Although he does not know much, he always tries to do the right thing in the right way. And he genuinely believes in those who are willing to help.

My relationship with Baba has changed drastically in the recent years, and my view of him also transformed. Before, Baba was always there to support us, treated us with presents, and provided clothing and food for us. He'd always made sure we were happy and in good health. Now, Baba is still trying to support us, give us life and work advices. However, I know he feels that he's becoming less helpful, because we, his children, are both living a different life and have different jobs that he's always had. Baba has been losing hair, that also turned grey; his back is curved and not able to stand straight; and he is constantly coughing. Because we have been so busy trying to establish our career, we often neglected Baba and Mama's needs. His overall health has been concerning, but he never complained much because he did not want us worried. When I slow down my pace, I realized that Baba is no longer the same strong man my

whole family looked up to and relied on. I have learned that he is ageing and he's just a typical human being who is also vulnerable. He also needs our support now, no matter how much he tries to ensure us he is okay. He doesn't want Mama worried, because she'd overthink and have sleepless nights. It is not good for her health, because Mama has already been warned by her doctor that she'd lose her mind if she doesn't let herself calm down. I realized that my parents are not as strong now and they need us. I regret that I haven't done much for them, so I try to give them presents that I hope to release them from overworking, such as a robotic vacuum to help cleaning the house.  I also gave them a massage chair, so that they can relax when them come from work. Although I wasn't able to give them the best or newest models, they still appreciate my efforts.

Since the indictment, it is the first time ever I've seen Baba so vulnerable. He tries to understand and reflect on what he had been doing wrong. As the only child living with my parents, I tried to stand by him. Although Mama is aware of the situation, he still tries to protect my mother by not disclosing the fact that he could potentially be imprisoned. He still assures her that things will be alright, and she needn't to worry at all. Because I have been raised by him and influenced by his strong character. I have also swallowed all the worry and tears in many nights. It has been very hard to see him so helpless, and I have to try to my best to stay calm and try to work with him to get whatever we could do to show his facts. I know he feels bad that he also has to show his vulnerable side. He's been depending on me more and more because I am the only child who lives with them. I appreciate the opportunity that I can at least stand by him through the hard times.

I have been through most of the process with Baba because he needs my help understanding English. He is truly remorseful of his mistakes, and he has been very cooperative with everyone as this legal matter comes to a final conclusion. Baba has learned his mistakes. I know he is doing his best to correct his mistakes and be respectful of everyone. No matter how tired he is, he always ensures Mama that everything will be okay. He is still supportive of my brother who's overseas, and myself no matter how he is. I know he will never make the same mistakes again. Because Baba does not know English and the law well, he always seeks for help to do things the right way. He relies on professionals to show him the right way. Because Baba was always so busy, he trusts that people who help them, as he trusts me to help him taking care of things that involves English. Through this situation, he has learned that he should be more responsible and involved in his matters. He is not pushing away his responsibilities, and he will accept his wrong doing. He has been our role model all my life, and I know he will continue to be my brother's and my role model, who is willing accept and rectify his wrongdoing.

My family was separated from my father for eight years; I hope we don't have to be forced apart anymore. We need Baba, and Mama needs her husband even more. Mama and Baba always tell us, as long as our family stays together, we can resolve everything. I know Baba will do his best to pay for the restitution to return the Government's loss. Our family will support him as well and help him rectify for his wrong doing.

I believe in our Judicial system that will determine if a person is truly remorseful for their actions. I truly hope that through your decision-making process you will come to the conclusion that my father, Quan Shun Chen, has true remorse. His cooperation with everyone in this matter shows his commitment to rectify his wrongs to everyone who has been negatively affected. I know my father is a good man. By allowing him to remain outside of a correctional facility he will be a model citizen who will never repeat his indiscretions.

I appreciate your time for reading this letter. I know my father is truly sorry for his actions as he has expressed this over and over to everyone involved. I leave this in your hands with hopes that you make your decision based on the character you have determined my father to have and how he has fully cooperated in this matter.

Sincerely,

Xiao Ling Chen

2/26/2019

# EXHIBIT C

The Honorable Judge Edmond E. Chang
United States District Court
219 South Dearborn Street
Chicago, IL 60604

Dear Honorable Judge,

I am writing this letter on the behalf of my father, Quan Shun Chen. I'm not writing this letter to explain why my father did what he did, because I know what he has done was wrong.

What I do want to do is to help you understand how much my father means to my family. My father came to America about twenty- five years ago when I was five and my sister was three years old. Like many other immigrants who pursue their American dreams, my father wanted to provide the best possible living environment for my sister and I.

During my childhood, I had great experiences growing up because of all the things that my parents were able to provide. My father always tried to make me happy by giving me treats and toys. My father never disappointed me, however he would not spoil me either. When I was young, soda was still very rare in China, especially in our rural hometown. My father surprised me with one of the new and tasty soda drinks. Holding and taking a sip of the drink with my father's help, I thought I was the happiest boy in the world. I'd never forgot the love and happiness my father gave me.

When my father left our family to go to America, I was very sad. But I was also determined to protect my mother and baby sister like my father always did, so my father didn't have to worry about us. My father was and always will be my role model, who loves, supports and protects his family selflessly.

When my sister and I arrived in America, my first impression of my father was a skinny and quiet man. He didn't talk much but always showed his love for us through his actions. To make up for his absence in our early childhood, he'd always take us to nearby parks whenever he had free time. When he had more time on some holidays, he'd take us to zoos and museums to spend more time with our family. Although my father is very frugal when it comes to himself, for us he never hesitates to buy things for us. I still remember whenever we needed school supplies he would always buy them no matter how much they cost. When my sister and I were attending middle school, it was very far from our apartment. No matter how late he worked the night before he'd always sacrifice his sleep to drive us to school, making sure we were safe and punctual. He also drove us home after school. He wished for us to succeed in school and wanted us to have the best possible opportunity in our future.

As a son, I could not ask any more from a father. He works seven days a week to provide for my family. He does not smoke, drink, or gamble. He is always trying his best to provide for my sister and me. I am proud to have him as my father.

My father has made mistakes and he has faced up to those mistakes. To my knowledge he has been very cooperative with everyone on this legal matter. He has been regretful for his actions and he is committed to right his wrongs to all parties negatively affected by his actions.

My father is a good man. He has always been a great husband and father. I know my father is truly remorseful for his actions. My father will be a model citizen who will never repeat his wrongs. Please allow my father to remain outside of a correctional facility under probation.

Thank you for the time you have taken to read my letter. I hope that you make your decision based on my father's character and his genuine remorse.

Sincerely,
Xiao Bin Chen

3.13.2019