UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18 CR 478 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| QUAN SHUN CHEN | ) | |

**GOVERNMENT'S MEMORANDUM**
**IN SUPPORT OF SENTENCING OF QUAN SHUN CHEN**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby states as follows regarding the sentencing of Quan Shun Chen:

## I. STATEMENT OF FACTS

The indictment in this case charges defendant with filing a false corporate income tax return, in violation of Title 26, United States Code, Section 7206(1) (Counts One through Five) and aiding and assisting in the preparation of a false corporate income tax return, in violation of Title 26, United States Code, Section 7206(2) (Count Six). On December 11, 2018, defendant pled guilty to Count Three of the Indictment pursuant to a plea agreement. Count Three charges defendant with filing a false corporate income tax return (Form 1120 with schedules and attachments) which was verified by a written declaration that it was made under penalties of perjury, and which defendant did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1). The Court has scheduled sentencing for April 3, 2019.

By pleading guilty to Count Three, defendant admitted that on or about June 1, 2015, in the Northern District of Illinois, Eastern Division, defendant Quan Shun Chen willfully made and subscribed, and caused to be made and subscribed, a U.S. Corporate Income Tax Return for Hunan Spring, Inc. (Form 1120 with schedules and attachments), for the fiscal year beginning March 1, 2014 and ending February 28, 2015, which return was verified by a written declaration that it was made under penalties of perjury and was filed with the Internal Revenue Service, which return Chen did not believe to be true and correct as to every material matter, in that said return reported on Line 1a that gross receipts were $635,044, when Chen knew that gross receipts substantially exceeded that amount.

***The Tax Returns***

Specifically, Chen was the sole officer and director of Hunan Spring, Inc., an Illinois corporation that owned Hunan Spring Restaurant, located in Evanston, Illinois, until 2015. In 2015, the successor Illinois corporation, Hunan Spring Restaurant Inc., was incorporated and took over ownership of Hunan Spring Restaurant. Chen became an officer and director of the successor corporation. For the years 2012 through 2016, Chen managed the restaurant, was primarily responsible for its financial affairs and was the responsible party for the tax returns.

Count Three: Chen signed and authorized the filing of a United States corporate tax return (Form 1120) for Hunan Spring, Inc. for the fiscal year beginning on or about March 1, 2014 through on or about February 28, 2015. Chen,

under penalties of perjury, stated on Line 1a of that return that gross receipts were $635,044, when Chen did not believe that the reported amount of gross receipts was true and correct in every material matter because he knew that this figure underreported the true amount of gross receipts.

Relevant conduct: In addition, Chen signed the following Forms 1120, U.S. corporate income tax returns, under penalties of perjury, as set forth in Counts One, Two, Four and Five of the indictment, stating gross receipts of Hunan Spring Restaurant as follows, when Chen did not believe that the reported amount of gross receipts was true and correct in every material matter:

| **Count** | **Date return filed** | **Tax Period & Entity Filing** |
|---|---|---|
| 1 | 5.6.2013 | 3.1.2012-2.28.2013 Hunan Spring, Inc. |
| 2 | 5.08.2014 | 3.1.2013-2.28.2014<br>Hunan Spring Inc. |
| 4 | 7.26.2016 | 3.1.2015-2.28.2016<br>Hunan Spring Inc. |
| 5 | 10.10.2016 | 2015 calendar<br>Hunan Spring Restaurant Inc. |

CHEN also aided and assisted in the preparation and presentment of a Form 1120 U.S. corporate income tax return filed on behalf of Hunan Spring Restaurant, Inc. for the calendar year 2016, by providing the information to the tax preparer including false gross receipts, which return was filed on or about November 6, 2017, and which return falsely reported on Line 1a that the amount of gross receipts for Hunan Spring Restaurant for 2016.

***The POS System at Hunan Spring Restaurant***

The Hunan Spring Restaurant used a Point of Sale ("POS") System, a computer system in which sales were automatically recorded and stored. The POS System was capable of producing, with the touch of a button, accurate reports based on gross receipts for purposes of providing accurate information to a tax preparer. Chen chose not to produce to his accountant an accurate report from the POS System, but instead to provide false handwritten and verbal information to his accountant, which purposely underreported the restaurant's gross receipts and tax obligations.

The sales representative who sold the POS System to Hunan Spring told the agents that in late 2011, he had installed at Hunan Spring the POS system with a device called the database manager, which allows deletion of data from the computer system so that reports of sales appear lower. The sales representative had serviced Hunan Spring's POS system since its installation. The sales representative identified Quan Shun Chen, the defendant, as his primary contact at Hunan Spring. The sales representative stated that at the time of the sale and during the initial installation of the POS System in late 2011, the defendant asked the sales representative about the deletion software device. At or around the time of installation, the sales representative showed the defendant how to use the database manager to delete sales.

In approximately February 2016, when the sales representative installed an upgraded POS system that does not contain a database manager, the defendant

asked him about installing a database manager. The sales representative referred defendant to another person who had developed a different database manager device for use on the POS system. When the agents executed the search warrant on March 5, 2017, the current POS System had the database manager device.

When the agents executed a search warrant at Hunan Spring, the agents seized the full POS database, which revealed that the database had approximately 9,700 deleted orders, as determined by missing order numbers. The missing order numbers were from the beginning of the data in December 2011, and continued for more than a year, through February 2013. (In addition to the 9,700 deleted orders, there was a large gap of order numbers in 2015 but that may have been attributable, at least in part, to the restaurant being closed for remodeling.) The agents discovered that daily closing reports of sales, known as Z reports, had been created on a daily basis and still existed in the computer database. Z reports are unaffected by subsequent deletions of sales, according to the manual of the POS manufacturer. The agents compared the Z reports to the POS data and confirmed that the Z reports showed no missing orders. Therefore, the Z reports have the actual sales data, with no deletions. Chen could have provided to his accountant the Z reports or other POS reports that would have reflected actual, accurate sales, but he chose not to do so. Instead, as he has admitted, he "estimated" the sales, always estimating lower than actual sales, even though Chen was in charge of the books for the restaurant and kept track of sales.

***Chen Intentionally Understated Sales for the Tax Returns***

Chen reconciled the books for the restaurant. He tracked the credit card sales in notebooks. During the execution of the search warrant, agents recovered one notebook covering about two months' of credit card sales. The government obtained the credit card sales data by subpoena and found that Chen accurately tracked credit card sales in the recovered notebook. The government also discovered that credit card sales alone exceeded the annual sales that Chen reported on the tax returns on 2013 and 2014.

On April 5, 2017, agents interviewed Chen. Chen admitted that he was actively involved in the finances of the restaurant. Chen knew that his partner or an employee printed the daily closing "Z Report" from the POS system, which was used to reconcile how much cash and credit card sales were generated on a daily basis. Chen was responsible for reconciling the receipts. Chen stated that once the daily credit card and cash sales were reconciled, the closing report was discarded (except that, unbeknownst to Chen, the computer system kept an image of the report). Chen also admitted that he kept a notebook of every credit card transaction, as described above.

Chen minimized his role, claiming that he rarely operated the POS system and usually relied on his partner to operate the POS system and to print sales reports. Chen claimed that he did not recognize the database manager in a photo of his POS system, that he did not understand computers, that he did not operate the POS system and that he did not operate a deletion program. When confronted with

the 9,700 missing orders, Chen claimed that he did not delete any orders and did not know who did. Chen's statements are contrary both to Chen's involvement in the finances of the restaurant and to the POS sales representative's recollection of his conversations with Chen about the POS system and the database manager, described above. Moreover, Chen's partner was not involved in the business when the deletions began in 2012.

It is true that Chen did not use the altered database to report his sales for purposes of preparing tax returns. Nevertheless, the altered database gave Chen "cover" for reporting a lower sales number than the actual sales.

Both Chen and his accountants stated that Chen provided all the information for the tax returns. Chen met with Maria Tai, the accountant, once a month to prepare Hunan Spring's sales, employment and income tax returns. Chen provided Tai with bank records reflecting the credit card receipts and further provided an estimate of cash receipts. Chen stated in his interview that although he believed that the POS records are accurate, he never provided the POS records to his accountant for the purpose of preparing tax documents. The accountant was not aware of the POS records. Instead, Chen provided the accountant with an estimate of cash sales in addition to the bank records showing credit card sales. Chen described to agents that his estimates were a little low but "close to correct." Chen also claimed to the agents that cash sales were $8,000 to $9,000 per month, which is the estimate he provided to Tai.

Chen stated that he paid certain vendors with cash, but claimed that these payments were typically for $300 or less. Chen claimed that he paid his employees partially in cash. Chen also stated that he took cash from the business for his personal expenses, but after paying employees and expenses, he claimed to have little cash left over. Chen estimated that he personally took $2,000 to $3,000 per year in cash from the business, plus tips of $2,000 to $3,000 per year. Chen did not inform his accountant of the cash payments to employees or to him. The agents told Chen that he substantially understated the cash generated by sales. When shown the difference between POS sales and sales reported on the income tax returns, Chen insisted that the difference was too large and that it was impossible that he took that much cash out of the business.

Chen also claimed that he provided estimates of expenses. *See* Defendant's Version of Offense, p. 2. Chen claimed at various times that the income reported on his tax returns was lower than actual sales because the income reported was simply the difference between estimated sales and estimated expenses. *Id*. Further interviews of the accountants and further reviews of the accountants' records show that this was not true. Chen provided itemized expenses and estimates of additional expenses separate from his reported income. The accountants maintained and reported the income separate from the expenses.

***Loss Amount***

The government based its tax calculations on the gross receipts reported in defendant's Z reports. The Z reports compared to the gross receipts reported on the federal tax returns show the following unreported gross receipts:

**Unreported Gross Receipts for Hunan Spring/Hunan Spring Restaurant**

| *Year* | *Entity* | *Gross Sales Per POS Database Z Reports* | *Gross Receipts Per Federal Income Tax Return* | *Unreported Gross Receipts* |
|---|---|---|---|---|
| 2012 | Hunan Spring, Inc. | $658,279.15 | $433,973 | $224,306.15 |
| 2013 | Hunan Spring, Inc. | $742,575.95 | $515,592 | $226,983.95 |
| 2014 | Hunan Spring, Inc. | $946,758.05 | $635,044 | $311,714.05 |
| 2015 | Hunan Spring, Inc. | $178,300.05 | $157,740 | $20,560.05 |
| 2015 | Hunan Spring Restaurant, Inc. | $491,091.83 | $422,624 | $68.467.83 |
| 2016 | Hunan Spring Restaurant,, Inc. | $1,212,081.43 | $995,498 | $216,583.43 |
| **TOTAL** | | $4,229,086.46 | $3,160,471.00 | **$1,068,615.46** |

The government accepted all expenses reported by defendant to his accountant, even when such expenses were questionable, such as a blanket deduction for "gas" without evidence that the vehicle was used for business. During the course of discussions regarding loss amount, defendant produced statements of

fees from delivery services such as "Grub Hub" that he had not produced to his accountant. The government adjusted expenses to include these statements.

Chen also failed to report accurately to the Illinois Department of Revenue the gross revenues generated by Hunan Spring Restaurant for the years 2012 through 2016, specifically for Hunan Spring, Inc. for the years beginning March 1, 2012 through February 28, 2016, and for Hunan Spring Restaurant, Inc., for the calendar years 2015 and 2016, and failed to pay fully Illinois state income taxes due and owing for that time period.

It is the government's position that the total tax loss resulting from the offense conduct and relevant conduct is at least approximately $454,662. Exhibit A attached hereto reflects the amounts attributable to federal income tax, state income tax and state sales tax.

## II. MAXIMUM STATUTORY PENALTIES AND RESTITUTION

Count Three carries a maximum sentence of 3 years' imprisonment, and up to one year supervised release. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the Court must order costs of prosecution, estimated not to exceed $500. Defendant also must pay a special assessment of $100.

In his plea agreement, defendant agreed to restitution. Docket No. 23, ¶¶13, 14. The government seeks an order for restitution in the amount of $454,662.

## IV. GUIDELINE CALCULATIONS

The government agrees with the PSR's calculations of the sentencing guidelines. *See* PSR ¶¶32-43. The resulting advisory guidelines range is 18 to 24 months.

## V. THE SECTION 3553(a) FACTORS

Pursuant to 18 U.S.C. § 3553(a), this Court should impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of Section 3553(a). Section 3553(a) takes into account, among other things, the guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, the need to afford adequate deterrence and the need to avoid disparate sentences.

### A. The Starting Point: The Guidelines

The government is well aware that this Court knows that Section 3553(a) requires that the Court take into account the advisory range set by the Sentencing Guidelines, as well as the Commission's policy statements. *See* § 3553(a)(4), (a)(5). Still, the government emphasizes that this Court should give serious weight to the advisory guidelines for two reasons.

First, the Sentencing Guidelines are the sole factor in Section 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor under Section 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d

606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."). *See also Booker v. United States*, 543 U.S. 220, 267 (2005) ("Congress's basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity.").

Second, the Guidelines generally deserve serious consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46, 128 S.Ct. 586, 594 (2007) (citation omitted). There is no presumption that a Guidelines sentence is the correct sentence, *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007), and a court has broad sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). However, the Commission is "a respected public body with access to the best knowledge and practices of penology; its judgments should not lightly be disregarded." *United States v. Wachowiak*, 496 F.3d 744, 753 (7th Cir. 2007) (internal quotation and citation omitted). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system, 28 U.S.C. § 994(o), and these ongoing efforts to refine the Guidelines are another reason to consider the advisory range in setting an appropriate sentence. *See Gall*, 552 U.S. at 49, 128 S.Ct. at 596 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark").

### B. The Nature and Circumstances of the Offense

Chen operated a lucrative restaurant, but embarked on a plan to avoid paying his fair share of taxes for years, 2012 through 2016. He had ready access to the accurate information for his taxes through the POS system, but chose instead to provide false estimates. He met with his accountant monthly, and each time he understated his sales. Then, over the course of the years 2012 through 2016, defendant signed sworn tax returns that misstated his income. It is particularly illuminating that after the agents executed the search warrant on March 5, 2017, Chen reported his 2017 taxes accurately.

This is a serious offense. Chen's conduct shows a disregard and disrespect for the laws of the United States. He failed to pay his fair share of taxes for years, until caught. The United States depends on people paying their taxes to fund programs needed for our country and our society. The United States uses that money for important programs like Social Security assistance to widows, orphans and the disabled, for national parks, the Coast Guard and the national air traffic control system, among other things.

Defendant's conduct delegitimizes the taxpayer system. Our tax system is by and large a voluntary reporting system that depends in large part on the honesty and faith of the taxpayers. When people like defendant engage in a scheme to defraud the IRS, it makes every legitimate, law-abiding taxpayer feel that the system does not work. Tax fraud matters because it is fundamentally unfair and because it chips away at a system that depends for compliance on the faith of the

taxpayers. Tax fraud is a crime that feeds on itself, reducing respect for the integrity of the tax system and leading to more cheating. Once the general public comes to believe that tax fraud is rampant and unpunished, the incentive for each person to pay his or her legitimate share of taxes diminishes and tax fraud becomes a vicious cycle. Thus, defendant's criminal conduct has a ripple effect on the ability of our federal and state governments to provide essential government services. If tax fraud is not sufficiently punished, respect for the entire tax system deteriorates.

In addition, defendant collected sales tax from all his customers, but only paid a portion of the collected sales tax to the State of Illinois, which constitutes theft from Illinois and causes the customers as well as the State to be victims of the scheme. Overall, by evading income and sales taxes the defendant gained a competitive advantage over restaurants in his market area that pay the correct amount of income and sales tax, this competitive advantage allowed the Defendant to gain market share and allowed Chen to expand Hunan Spring into a much larger restaurant space in 2015.

**C. History and Characteristics of Defendant**

Defendant certainly has accepted legal responsibility, but he does not appear to have accepted moral responsibility. He has minimized his conduct from the beginning, hiding behind his lack of education and his purported reliance on others.

In his initial interview, defendant claimed that he did not even know how to operate the computer system at the restaurant. This is untrue. The sales representative recounted Chen's involvement in the purchase, installment and

operation of the computer system. The sales representative taught Chen how to use the database manager, which deletes sales. When the sales manager updated the computer system without the database manager, Chen requested that the database manager be installed. The sales representative told Chen that he no longer installs the devices, and gave Chen the name of someone else who could install the device. When the IRS agents executed the search warrant, Chen's POS system had a database manager installed.

In addition, Chen admitted that he kept the books and records of the restaurant. He reconciled the daily transactions with the Z Reports. He kept independent logs of the credit card sales, which were accurate. Chen met with the accountants and took on the responsibility for reporting the income and expenses of the business to the accountants.

Defendant claimed in his version of the offense that because of his lack of education, he relied on the advice of his accountants. Chen's experience and responsibilities, described above, show that he was much more adept at record keeping and accounting than he claims. He not only appears to understand basic record keeping and accounting, but the accuracy of his credit sales logs shows that he was quite competent, if not good, at it. He also managed to keep and report itemized expenses to the accountant, which reflects that he understood what the tax returns required.

Chen claimed in his version that his accountant never asked for the Z Reports, but there is no evidence that she knew about these reports. Defendant,

who reconciled the books with the Z Reports daily, knew about the Z Reports but did not provide them to the accountant. Instead, he chose to provide his accountant with inaccurate estimates of sales. Defendant claims in his version of the offense that his accountant told him that she did not need any records, only estimates, and that she "was comfortable" with this approach. This is belied by the fact that defendant did provide his accountant with records of certain expenses, and that his accountant reflected income and itemized expenses separately. Moreover, defendant took advantage of this approach to underestimate income consistently. His estimates each year resulted in him paying less than his fair share of taxes. That did not happen over the course of years by ignorance; it was a deliberate scheme to avoid paying taxes. It is particularly telling that after the agents executed the search warrant, defendant knew how to report his 2017 income accurately.

Chen also denies that he deleted sales or even knew of deleted sales. He did not use the altered database to support his underestimated sales, so his deletions are not the cause of his understated revenues. But Chen is not being candid when he insists that he had never deleted sales — circumstances point to Chen as the only one who could have deleted sales. Chen interfaced with the sales representative about the database manager, and Chen sought a new database manager when the new POS system did not have one, Chen was responsible for keeping the books and records, for reconciling the sales with POS Z Reports and for reporting sales to the accountant. There is no way that anybody else could have deleted so many sales without Chen's knowledge.

Chen, in his version of the offense, suggests that the deletions occurred during software demonstrations when the business was still learning how to operate the POS system. The POS system was installed in December 2011. Thousands of deletions took place through February 2013. These deletions stretch beyond any initial "learning period."

Chen hides behind his lack of education, pretending to have relied on others for advice, namely his accountants. This is evidence from his daughter's letter, which claims that her father's lack of education caused him to rely on others with more education to prepare the returns, and that is why he is in this position. The daughter could have gotten this view only from her father, who offers the same excuse in his version of the offense. Yet, several interviews of the accountants and a review of the accountants' records show that the accountants reported the income provided by defendant, before expenses. The accountants also reported the expenses provided by defendant, even when the expenses were questionable and/or undocumented. Defendant's consistent underreporting of his revenues was the result of his deliberate conduct, not the result of a lack of education or poor accounting.

It is admirable that Chen, with a sixth-grade education, came to this country and operated a successful business. That is "the American Dream." Defendant became a naturalized citizen of this country on or about March 3, 2011. He stated to Probation that he came here "to work and earn a better living." PSR ¶62. He succeeded, likely through hard work and determination. Yet, as the recipient of

such opportunity, he owed his country to abide by the laws, including paying his fair share of taxes. He showed a lack of respect for the laws of his newly adopted homeland. Instead, just as he was accepting citizenship, he was stealing from and cheating his new country, and he continued to do so for the next four years, until caught.

The defendant is not standing before this Court because he lacks education and had to rely on others to guide him, to his detriment. He is standing before this Court because he intentionally believed that he could get away with understating his income on his tax returns, so that he could pay less than his fair share of taxes and keep more of the money generated from his business for himself. When caught, he admitted his underreporting, but minimized his conduct and has continued to do so.

### D. The Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

Here, respect for the law, just punishment and adequate deterrence are significant factors for the Court to consider in sentencing defendant. An adequate prison sentence is necessary to address these Section 3553(a) factors.

Defendant has demonstrated a lack of respect for the law. Beyond committing the offense over the course of years, he lied to the federal agents when caught.

The Court also should consider adequate deterrence in setting a sentence. Defendant may not have a risk of recidivism, but general deterrence is a factor in setting defendant's sentence. This was not a victimless crime. The cumulative effect of this crime is significant. When others see that a person convicted of cheating on

taxes does not receive any prison time, it makes it seem that it is not a serious matter and that everyone can do it. It is important to provide appropriate punishment so that the defendant and others understand that the law treats tax violations seriously. A prison sentence is appropriate and, more importantly, is necessary to serve the purpose of Section 3553(a).

## CONCLUSION

WHEREFORE, the United States respectfully requests that the Court sentence the defendant to a sentence of imprisonment that is sufficient but not greater than necessary to serve the purpose of the Section 3553(a) factors,

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ Sheri H. Mecklenburg*
SHERI H. MECKLENBURG
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300